2-0-9-0-5-0-5 Indian Prairie School District v. Workers' Compensation Commission May it please the Court, David Victor on behalf of the employer, Indian Prairie. This case involves a teacher's aide who had two injuries, only one of which is the subject of the current appeal. September 20, 1999, she was knocked off a therapy ball and hit her back. The Commission determined that that was a temporary aggravation of a back condition. Can you speak up a little bit? I'm sorry. The Commission determined that that was a temporary aggravation of a back condition. January 31, 2000, she tripped over a bean bag, striking her knee on the floor, and that is the subject of the current appeal. Those bean bags are very dangerous. The employee suffered an injury to her left knee. It was complex regional pain syndrome as a diagnosis from both treating physicians, Dr. Koran and Dr. Glaser. The petitioner treated for several years. Eventually, there were depositions of both those doctors, and both of those doctors opined that the petitioner was medically unable to work. They both relied on a functional baseline assessment, which Dr. Glaser found was a quick and dirty estimate of what they could do, per his deposition testimony. The Commission determined that the employee met her burden of proof in establishing that she could not work, based upon the medical opinions of Dr. Glaser and Dr. Koran. They both relied primarily on this functional baseline assessment. The functional baseline assessment indicated the petitioner could work 10 pounds lifting, two hours walking or standing, two hours sitting with the ability to stand every two hours. That same assessment indicated there were some moderate bending, lifting, and squatting limitations. The Commission determined that the opinions of the doctors as to the ability to work, along with the testimony of the petitioner, were the basis for her determination that she was permanently and totally disabled. It's the employer's position that this is against the manifest weight of the evidence, given the fact that, well, it's really twofold. First, the FBA is not a reasonable assessment of what she could do, based on the testimony of Dr. Glaser. And secondly, that even with that baseline assessment, it indicates she could do certain activities, and it looks as if she could work a sedentary job. And neither of the doctors testified to any extent as to why these limitations would prevent her from working a job. And the Commission, in turn, merely relied upon the evidence depositions of these two doctors to determine that she could not work. And the claimant's testimony. Correct. And the claimant's testimony. The claimant basically testified to the same things, a little bit different than the FBA, but then she indicated at one point in the testimony that, well, I got tested on the FBA, and that's basically what I could do. There were some differences in what she said she could do in terms of standing. And so the opinions of the two doctors and the claimant would not be sufficient under the manifest weight of the evidence standard? Well, the question is, when the Commission makes a determination that she can't work at all, those two opinions rely on the FBA. And the FBA merely says that she has limitations. There's no question she should have some limitations. The question really is, in determining whether she can work at all, how do they make the determination other than to rely on those medical opinions? And then you go round and round. Those medical opinions relied on the FBA. Well, the FBA says she could work. It doesn't say she can't work. It says she could work with restrictions. The doctors then turn around and say, well, I don't think she can work because she has restrictions. I thought that Curran also said the primary problem was the severe pain, which causes her to have been able to stand, sit for significant periods of time, et cetera. Did she also say that? She did indicate there was severe pain. Dr. Curran did not examine the employee. She took over, or rather, Dr. Glaser took over the care of the employee two years earlier. So she was relying primarily on what she recalled from her evaluations and from the medical records. There's no question there's pain. The petitioner testified that she has pain and that it's reduced with the use of medication. It's the employer's assertion that the claimant has not met her burden of proof. She hasn't proved by preponderance of medical evidence and proved all elements of her claim. And the commission itself, when you look at the opinion, it's more like just giving us one line that says I'm relying on the medical opinions. The commission itself makes some, I think, some errors in terms of causal connection. The commission determined that the petitioner injured her back in 1999 and that it was nothing more than an exacerbation and all her back pain was related to the 2000 incident. But both medical doctors indicated it all related back to the 1999 incident. So there's some errors there and just some very unclear determinations from the commission. And I don't think the commission itself has indicated that the claimant has met her burden of proof, other than to just say that there were medical opinions saying that she couldn't work. It's the province of the commission to determine whether the claimant can work. It's the province of the doctors to determine what those restrictions are. And it's our assertion that when the doctors determine their underlying opinions on nothing more than a quick and dirty estimate of what the petitioner could do, that that's not reasonable. Well, okay, so if there was another, if there was a full FCE, would that have, it might have been more probative. Does that mean that the one that was actually done was invalid? I don't believe, well, the what was done, I'm not saying it's not valid. What I'm saying is that the commission has to determine, based on the medical evidence it has, whether this claimant can work. And versus giving her other benefits that she might get. And instead of a permanent total disability, they may look at whatever, the FBA or the FCE, and determine that she can work. There's nothing in the record, in my opinion, that determines that she can't work under the restrictions that were given. It's the commission itself that just determined, well, I've looked at the medical opinions, and I don't think she can work. Well, didn't Curran give an opinion specifically that she's incapable of employment? Didn't he testify? Well, Curran testified incapable of employment, but again, that's for a vocational expert. We're looking at medical evidence when it comes to the doctors. And then it's the province of the commission to determine then, based on that medical evidence, whether that person could work. Are you saying the commission erred as a matter of law, or it's against the manifest way? What exactly? You seem to be saying there's an inherent flaw in this whole case. Well, the flaw in the case is limited to the determination that the petitioner cannot work. It's based only on the two medical opinions that rely on the FBA, and it's the respondent's position that it's against the manifest weight of the evidence, because there's really nothing in the record or the commission's decision that indicates why, based on these restrictions, even if we accept them as true, why she can't work a sedentary job. I mean, it says she can work 10 pounds lifting, two hours walking or standing, two hours sitting with the ability to stand every two hours. That's a sedentary position. The question is, why can't she work a job with those restrictions? And the only answer we have is because, well, the doctor said that she can't work. But it's not the province of the doctors to determine whether she can't work, it's the province of the commission, and all the commission has is that one single restriction. So for that reason, the respondent requests that the case be overturned, and that a decision as to the permanency be awarded rather than permanent total disability. Counsel, please. Good morning, Your Honors. My name is Attorney Edward Starkman. I represent the appellee, Francine Norris Kristner. I've represented her throughout the entire case at all levels of the administration of justice, at the trial of the case, and through all levels of appeal. And at this time, I'd like to rest on the merits of my brief, but I welcome any questions that the panel has for me at this time. Thank you very much. Well, I guess I will ask one, since you've been good enough to reduce your time. Obviously, you heard your opponent's argument that the opinions of the doctors were flawed. They were based upon a test that really, he doesn't believe, gave him the indication that she was unable to work. So what's your succinct response to his arguments? Very succinctly and right to the heart of the matter, the commission relied on Dr. Mary Jo Koran and its findings. Dr. Koran is a pain management specialist. She deals with the issue of RSD or complex regional pain syndrome on a regular basis. And she looked at Dr. Glaser's medical records and his transcript from his evidence deposition, and the baseline evaluation of the partial FCE. She looked at that report prior to testifying at her evidence deposition, and she said that despite the fact that Dr. Glaser's medical records were not a full FCE, it was a partial FCE, and looking at Dr. Glaser's medical records in their totality, that did not change or alter her previous opinions regarding this patient at all, including the one involving permanent and total disability under Section 8 of the Act. Okay. Did anybody move to strike a testimony of either Koran or Glaser? Is that the other doctor's name? Because of lack of foundation, qualification to offer an employability opinion? I think that because Glaser and Koran were both pain management specialists, they were able to not only... That was my question. I said, did anyone move to strike? Oh, nobody moved. No. So they let them testify. That's the areas that arguably are out of their area of expertise. Well, they did testify that based on her pain, the diagnostic treatment, the blocks and everything that were administered were not only for treatment purposes, they were for diagnostic purposes. And the record clearly shows that the petitioner had a temporary improvement, which confirmed the diagnosis, not only from those two doctors, but the record also contains a third pain management doctor, Dr. Kim, who she initially started treating with, referred to him by her orthopedic surgeon, Dr. Gregory Markarian. Dr. Markarian initially referred the patient to a pain management specialist. I guess what I'm saying is, you've got pain management specialists. What does a pain management specialist know about jobs out there with those patients? Well, she said that the pain management specialist, based on the treatment, the pain that she was having, her subjective complaints, the change in color of her extremity, the lower extremity, the extreme response she had to high and low temperatures, and especially, I'd like to point out, the pain management specialist, Dr. Markarian, said that it was a common characteristic of RSD, or chronic pain syndrome. Well, you're talking about whether she has it. Let's just assume, arguendo, she has it. Yes. I mean, the opposing counsel is saying, okay, so she has it, but there's only work restrictions given her that seemingly are sedentary. That's with all due respect, I beg to differ, Your Honor, Dr. Koran did testify in her evidence deposition that, in her opinion, based on the entire record of medical evidence that she reviewed prior to her evidence deposition, that this employee is permanently and who's going to be on opiate managements indefinitely, which she still is, and she has been throughout the entire case. And opiate medications are quite disabling in and of themselves. Petitioner's chronically tired, can't drive, confused when you're on opiates. She's going to be on that indefinitely throughout the remainder of her life, sadly. Is a restriction against any form of work a legitimate medical restriction? I think that that's a normal, in the realm of a normal question to be asked a specialist regarding permanency. And workers' comp is based on permanency. Well, permanency is that the injury will last forever. That doesn't mean it can't work. My question is, is a restriction against working at all a legitimate medical restriction? Can a doctor say, I'm restricting you from any form of work? I think in this case, based on the extreme response that the petitioner had even to light touch, and that she couldn't even comb her own hair without assistance or get dressed without assistance, with those types of things that she was battling, I think that the restriction was a reasonable one. I think it was eminently reasonable for both pain management doctors to address the issue of permanent total disability for many and all occupations going forward. Thank you, Counselor. Thank you, Your Honors. The final plea. Briefly, Your Honor, the pain management specialists that testified aren't qualified as vocational experts. The attorney who handled the case did not move to strike the opinion. But just because the opinion wasn't stricken doesn't mean that it carries credibility with the commission. Certainly the commission can look at this and determine the credibility of the doctor to opine in this area and afford it the weight that it deserves, which in this case is not very much. In the commission's opinion, the problem is if you have an objection that would go to a foundation and you don't object or move to strike, it stands in the record as evidence and the commission is free to give it whatever weight it wants. Correct. And you're saying, well, in our opinion, the commission shouldn't have given it any weight, and yet it's in the record. It is in the record. There's no indication that the commission gave any specific area of the testimony more weight than any other. It just said based on the medical opinions. It didn't say that it was relying on their opinion that she couldn't work. It could be that the commission was relying on the opinion that she had certain restrictions and then the commission itself made the decision that the petitioner could not work. Remember, in this case, it's not the doctors who generally have a medical permanent total disability versus an odd lot, which you would have vocational testimony. It's purely medical. The commission then will make that determination as to, based on the medical evidence, whether that permanent total disability exists. So it's our assertion that we really don't know, based on the award that we have, but certainly you're correct. If the objection had been made, it wouldn't even be in the record. But just the fact that it is in the record doesn't necessarily mean that the commission was correct in making that, and it's not against the manifest weight of the evidence, because the only thing we have, we don't have the underlying opinions. All we have is testimony, I see from Dr. Coran, the primary problem is severe pain, which causes her to be unable to ambulate with ease. Well, that's taken care of under the FBA. So we keep going back to that. It's taken care of as to she has limitations. We know she has limitations on her ability to ambulate, and they're delineated in the FBA as the functional baseline evaluation versus a functional capacity evaluation. And there is a huge difference between the FCA and the FBA, and that's detailed in my brief. So it's our position that we're looking at weight of evidence, and we're looking at the commission's decision, again, to go and say, this is a permanent total disability versus this is something that requires permanency. We're looking at someone who has restrictions. We admit that. The question is, can she work in a reasonably stable labor market? Thank you. Court, we'll take the matter under advisement for disposition. Clerk, please call the last case in the morning. Good morning, Your Honor. May it please this Court, counsel. Your Honor, this is a one-time industrial accident. It appears that the Industrial Commission and the arbitrator treated this almost as a repetitive type of exposure, unlike the FBA. Very similar to the case you heard earlier in U.S. CAN. This is a one-time industrial accident where the petitioner, Scott Hodges, was exposed to a known chemical, phenol, which was identified in the material safety data sheets, not only by Dr. Conabare, Dr. Lichen, Dr. Mercury, and Dr. Punja, but all of the doctors identified the one chemical that Mr. Hodges was exposed to. And the difference with this case and amongst many others is that all of the doctors, it's undisputed, agree that Mr. Hodges was exposed to phenol. All of the doctors agree that the phenol was the exposed agent that caused Mr. Hodges to suffer from his subsequent disability, except for one physician, and that's Dr. Conabare. And Dr. Conabare is the IME physician of Argonne National Lab, who was the ex-employee of Argonne National Labs, who apparently takes on the role of examining physician for Argonne in these types of situations. I am arguing to this Court that an instant replay is required, that De Novo, that this Court has De Novo jurisdiction over this case under well-established Illinois case law, under the Illinois case law. Under Bushio and under Boussaites. Boussaites clearly gives this Court jurisdiction to review the issue of causation. It is very rare, however, Boussaites gives this Court the ability to review this case under De Novo jurisdiction because Dr. Conabare did not have the ability to review the issue of causation. Dr. Conabare did not rely on all of the facts on this case in order to render the opinion which the arbitrator subsequently relied upon. Dr. Conabare ignored a significant fact in this case. Which was what? Pre-existing condition. His premorbid state, Your Honor. Mr. Hodges' premorbid state was one of a functioning, full-time, full-duty employee of Argonne National Lab. And that was not taken into consideration. And I believe the Castings case, which we cited to, is the case that allows us to look at that and overturn Conabare's decision, look at her opinion and say that it was incorrect. Well, what's the linkage between what you just said and Conabare's opinion? How does that, what you just referred to, overturn Conabare's opinion? Because Conabare states that basically, without just saying it right here, that Scott Hodges is an alcoholic. That his condition is due to alcohol, either abuse or because of alcoholism. Okay, so that's, yeah, basically that's underlying that. That's what she is saying. What do you have to suggest that you have this dormant, non-symptomatic, that you're saying, I guess it's called whatever the term is, but that this phenol brought it into being? Your Honor, I can't even say that the phenol awakened some sort of alcoholism because there was a condition here. The condition was the phenol exposure, and immediately thereafter, there was symptoms. It really, it defies logic to look at this case and not find a causality between the exposure, the immediate onset of symptoms, and the subsequent disability that resulted from it. But we still have a causation, logical causation, that has to be found. I mean, otherwise, it's post hoc or pro quo. Correct, Your Honor, and again, the logical causation is the evidence that's presented by all of the other physicians. Namely, we can look at Lycan, who's the toxicologist. And Lycan, I know there was a suggestion in the Respondent's brief and also in the arbitrator's decision that Lycan did not rely on facts of the case. He relied on facts and science, but that is absolutely incorrect. Lycan, and I have the list, Lycan based his opinions on science and fact. Number one, he testified that there was an event. Nobody disputes that there was an event here. There were multiple people who were exposed. Well, I don't even think that's in play here. I don't think that the Respondent is disputing there was an event here. But that's why I'm saying, Your Honor, that it's important of the undisputed portion of it so that you can review this de novo. There was a chemical which was identified. Nobody disputes the chemical. The chemical was identified through the MSDS sheets. There was the immediate onset of symptoms, which all of the people who were exposed to it, that location on that same date at that one-time exposure complained of. They all testified and they all complained of the same type of smell and they complained of the same types of symptoms. Clearly, we have a temporal relationship. Well, here's one of the things that I mean to ask you before we get sidetracked, and I think this is critical. It's my understanding from the record, only Dr. Canabare based her opinion on the actual level of phenol exposure, which obviously would have to be significant. None of the other doctors addressed the level of the phenol to which the claimant was exposed or offered a causation opinion based upon that information. Is that correct? I disagree. Isn't that a significant difference? I disagree. Wyken in page 427 of his record, I believe, also cited to the level of phenol. And, Your Honor, may I point to you that that urine count was taken on January 5. This exposure occurred on January 2. So even if we want to look at that urine phenol count in a narrow window, it's abnormal. Twelve is abnormal. No matter how you want to characterize it, it is above the normal count. And that was taken three days after the exposure. And that was by Dr. Stalker at Argonne Lab, who requested that Mr. Hodges come into his office and undergo examination. So three days there was a significant, now the word is escaping me, desynthesization of the phenol in Mr. Hodges' count. So it's a very good point, because even 12, three days later, is abnormal. Doesn't that count? And cannot that count for his symptoms? What we've done, Your Honor, is we've established a prima facie basis for exposure and causality. It defies logic that his symptoms following this occurrence, which were never complained of, if you look at the old adage of the one tick of the clock. At the one tick of the clock before this occurrence, where were these symptoms? Where was Mr. Hodges' disability, according to industrial commission definition, as far as his ability to work? All of that counts. It is critical to the analysis of this case to determine proximate cause. And Dr. Conabare is stating that alcohol is the only cause. And so what causation opinions do you have to contradict that? He had no symptoms prior to exposure, even if he was guilty of alcohol abuse, I think is the argument. I'm sorry, Your Honor, I didn't hear. I said I think the argument is that he had no symptoms prior to exposure, even if he was guilty of alcohol abuse. That is correct. That is the argument here. I mean, the symptoms of lightheadedness, nausea, vomiting, and the wooziness, none of them were present. I mean, it would have to be. I understand the argument. You don't need the medical. You could rely on the good health, and then after the incident or exposure, he could become, have symptoms. But I was just wondering, in addition to making that logical argument, do you have any medical evidence that connects the exposure to the condition? Well, I think Dr. Lykin clearly states in his report. I mean, he clearly ties the proximate causation between phenol. He goes on and on. I mean, as a matter of fact, even when he reports, if Your Honors disregard entirely my argument of res judicata, I'm sorry, of collateral estoppel with the U.S. Department of Labor report, look at what Dr. Lykin reports to the U.S. DOL in terms of the basis for their findings. You don't have to rely on U.S. Department of Labor if you feel that that argument is either stale, or I didn't raise it at some other point. But just look at what he relies upon in terms of his basis for his opinion. And he explains exactly what it is. And that's why I say it defies logic. And if we go to Conabare, you know, Conabare does have a bias here. She does have motive. Is it evident? No. But it's there. It's out there. As an ex-employee, how does one give an opinion when that opinion is suggested in the introductory letter to Dr. Conabare in terms of what she should find? Dr. Stalker clearly suggested the opinion that she should render in the introductory letter to her. Did the commission know that? Yes, Your Honor. Absolutely. So how does that upset the commission's decision? It upsets the commission's decision because if we reverse and if we go under manifest weight of the evidence, you know, if you look at the standard of manifest weight, if Your Honors choose to look at manifest weight, you know, I don't know where that falls. I guess it falls somewhere between beyond a reasonable doubt and preponderance of the evidence. An opposite conclusion is clearly apparent. And that's exactly it. An opposite conclusion is clearly apparent because Conabare failed to rely on premorbid state, which goes to Justice Hoffman when he said about there's no symptomatology before this. If there are no symptoms, I can't even say that this was an aggravation. And I'm not going to because there's no indication that it was an aggravation. These are new symptoms, new findings. And I behoove counsel for respondent to find anywhere in the record where these exact symptoms were found in the record to the physicians before this because they weren't. So the issue is very narrow here. We have exposure. It's simply the causation of those symptoms, to disability. And under de novo, this Court may review this case under de novo, under established case law. And if Your Honors choose not to review this de novo, manifest weight is clearly a standard which you may review this under because an opposite conclusion may be reached based upon your opinions on that and the totality of all the circumstances here. I have a question here. You're talking about there's no symptoms prior to this incident, right? You're saying that's important? Yes, Your Honor. Well, isn't the preexisting condition she's suggesting, though it's dormant, would imply there would be no symptoms and that the preexisting condition, the toxic encephalopathy. The toxic encephalopathy. I agree with you. Had there been a diagnosis of alcohol abuse or alcoholism before this. This issue comes up only post-occurrence, Your Honor. But how did she come up with the concept of alcohol abuse except by prior medical records, right? There was, yeah, I think it was Dr. I believe it was Dr. Mercury who was the internist who had some indication in there. But there was never a diagnosis of alcoholism made or even a recommendation for treatment. And most importantly, Your Honor. But if you look at the records and look at how many beers are consumed every day, I mean. Oh, no, Your Honor. That was an extrapolation made by the arbitrator made on his own. I so disagree with that analysis that he made. Because somebody could say, yes, I consume ten of something and then you're going to multiply that ten times every day of the month and times the year. So I don't agree with that. I don't agree with that interpretation. So where did that come from? From medical records? What came from the medical records? Ten to twelve beers a day. That came from the medical records. That came from the medical records. But again, if we. And those medical records were looked at by Dr. Conover? Yes. Okay. But again, Your Honor, I just want to emphasize that the disability occurred during a one-time traumatic event. Typically exposure cases, I shouldn't say typically, but more likely than not, they occur over time. This was not. This was at Argonne Lab while they were demoing out one of the testing rooms and they were exposed. So this was a one-time exposure hazmat type of call. Counsel, you'll have time on rebuttal. Thank you, Your Honor. Counsel, please. Good morning. My name is John Campbell, Counsel. I'm here on behalf of Argonne National Lab. The appellee in this case and I want to. There's a lot of elements here addressed by counsel. I'm going to try to get to them all succinctly. But first and foremost, I want to point out this is and always has been a question of fact. Whether or not the phenol exposure was sufficient to cause these symptoms. It's a question of fact and therefore this is a manifest way to the evidence review. The case cited, this national castings case, where the court appeared to use a de novo review despite there being only an issue of fact. What the court pointed out in that case, because I read it and I actually qualified his opinion on deposition and said, well, there could be an exposure. And for that reason there was a reversal. I actually view that as a reversal on a manifest way. But I digress. There's a difference here. When Dr. Conabare conducted her examination, she did review all of the material data safety sheets, the industrial hygiene tests, all of the medical reports from the days following this event. None of the other doctors did. None of them. That is why Dr. Conabare's opinions were considered to have more weight by all of the prior trials of fact. Can you address the threshold question? Your opposing counsel lays out a chronology that I think, quite frankly, has some superficial appeal. He's saying that, look, there's no dispute by anyone, including Argonne, that there was an exposure to phenol. He's symptom free. All of a sudden he ends up with these symptoms. Can't the argument be made obviously the exposure had a causal connection to his condition? How do you argue it did not? I think that would be an excellent argument if we weren't at Argonne National Lab and didn't have all of the testing performed that were above that conclusion. I'm not pointing to just the urine samples and the blood samples, which arguably were taken a few days later, where the substances were found in nobody's body, petitioners or any of the other workers. For the sake of argument, let's say, well, maybe they were exposed that day. Well, there were vapor readings from the room. The thermometer itself was tested and had inconsequential amounts of phenol and mercury. If you look at that industrial hygiene test, they went so far as to take another exact replica of that thermometer and tested its contents to make sure that the levels couldn't be enough to garner an exposure to harm anybody. No levels were ever found sufficient enough to be outside of OSHA guidelines and were all inconsequential. So how did he end up with the high level? He's been drinking 3,600 beers a day. Oh, I'm sorry. 3,600 beers a day? With regard to the phenol. I thought you meant the toxic encephalopathy. You mean with regard to the phenol? Well, I think that is a red herring. Counsel is saying that a reading of 12 micrograms per liter is elevated. It is not. And if you actually read the record, you'll see. Was he 15 or 12? He was 12. He was 12. And isn't it 10? Isn't it 10 to cut off? 10 is effectively the background level. You can have a reading of 20 by using lip balm or Carmex or a throat lozenger. And Dr. Conover points that out. So do the industrial hygienists when they evaluate the case. So to suggest that 12 is an elevated level is really incorrect. It's flat out incorrect. And Dr. Conover points that out. You say all the other people that were in the room were also exposed to the same levels as the claimant here did not show any. The highest levels, and it's in the record, the highest levels shown were 20. And that was deemed to be because they were using Carmex or lip balms. So they commented on why the reading on at least one or two individuals was elevated to 20. And that was found to be because they used lip balm. And the drinking of the beer then you're saying? Yeah, I'm sorry. I think I answered too quickly. That doesn't affect phenol as much as it affects the underlying diagnosis, which is the same for alcoholism as it is for a phenol exposure, which would be toxic encephalopathy. Okay. Now, changing the facts a little bit. Let's say that the claimant admits I'm an alcoholic. I have toxic encephalopathy or whatever. Right. But it's normal. Now I got exposed to phenol at an elevated level, and now I'm symptomatic? Right. Is that recoverable? That is why I go back to all of the evidence that Dr. Conover reviewed to conclude that it is not, because it's, in fact, impossible to have suffered these symptoms. Even in an aggravation of a preexisting condition, if all of the levels tested are far under the acceptable levels for what would be considered an occupational exposure. Well, but that isn't based on a non-alcoholic person. Well, Dr. Conover certainly knows that he was alcoholic, as she states it, so I have to assume, without being able to ask her now, that it was based on the presumption he was. But you understand the importance of that distinction. I do. And that's why I've said in every level arguing this case that if this weren't Argonne National Lab where they could conduct these tests, I think they have to. Yeah, but it doesn't matter. It doesn't matter. I don't care. They've conducted the test. But now we've got a special case here, arguably, an alcoholic who's got dormant, whatever that condition is. And it may well be that alcoholics exposed to what would be considered to be a normal background level of phenol can get these symptoms. It may be that alcoholics using lip balm or these throat lozenges get these symptoms. But the fact is he was exposed to phenol in the workplace and got these symptoms. Would that be compensable? Okay. I don't believe so in this case because of the levels demonstrated by all of the scientific testing done. And that's why I think that's – I'm coming back to that, Your Honor, because I believe that to be so important. Wait a minute. Isn't there sort of flaw in the argument? You're saying that these levels mean they're safe. Safe for who? The average human being or safe for the alcoholic? That was never addressed in terms of the material safety data sheets or the industrial hygienist. But I'll point out that those levels, if safe was five parts per million, the levels found were 15 parts per billion. It was such an inconsequential amount. And by the way, it's worth noting, when the thermometer broke, the gentleman, Mr. Hodges, was not there. He came in, he directed other people to dispose of it, and he left for lunch. He came back and smelled the odor. And by that time, the fire department was called as a precaution because there was concern that there was some burden. Okay. I think my learned colleague is going. You have the convergence of two doctrines. One, the employer takes the claimant as they find them. And two, under CISPRO, the aggravation of a preexisting condition would still be compensable. So that's the theory that's being advanced. I understand, and that is why, again, relying on Dr. Conover, who found it is not a causally related. In other words, you're saying this could have had no effect even on somebody who was an alcoholic? Is that what you're saying? Absolutely. And I think all of the evidence demonstrates that. Why is that? Because the gentleman drank before and after, and his symptoms can be more readily explained by the continued consumption of alcohol, which is toxic, leading to the diagnosis of toxic encephalopathy. Well, do you know how many – you said something about – you said 3,600 beers a day, which I assume – Yeah, the arbitrator said it. Yeah. It was a misstatement, obviously. I don't know that that's a misstatement. It's gleaned from the fact that he said he drinks 10 or 12 beers a day, so. 3,600 beers a day? Did I say a day? A year. I'm from the South Side, but even we can't – We can take judicial notice that that's impossible. All right. Yeah, 3,600 a year is what the record says. If you're going to shoot the questions, a few other points that he raised. The collateral estoppel argument, I just – I want to point out – I don't know if the Court's going to take heed to it with any merit, but this is barred for a number of reasons. This was not a hearing that the Department of Energy had. This was a phone call to the petitioner, and they accepted one letter from Dr. Leakin to base their decision. There was no opportunity for contrary evidence to be presented. The collateral estoppel would not apply, are you saying? I don't believe so, Judge. I want to make sure I address that. And, again, ultimately, it is the Commission's discretion to weigh evidence. The fact that Dr. Leakin had none of the research of the days following this incident to base his opinion, the arbitrator, Commission, and circuit court judge all recognized that the opinion had less weight because he did not have all this information, was not privy to it when he offered his opinion on causal connection. That is why Dr. Conover's opinion was considered more valuable. It is within the discretion of the Commission, and, therefore, this should be affirmed unmanifestly. Thank you. Counsel, please. Thank you, Your Honor. The restatement of torts indicates that to establish proximate causation, a plaintiff must show that an event in the natural or probable sequence produced the injury complained of. And that's exactly what we have here. We have natural, probable sequence of events. We have exposure. I'm sorry, we have event, exposure, complaints, and subsequent complaints of disability. And before the event, there's a tabula rasa. It's a blank slate of anything with respect to complaints or even disability. You couldn't convince Commissioner Mason or Dauphin with respect to your position? They relied on Dr. Conover, which is what the arbitrator relied upon. And, Your Honor, that's why I'm saying instant replay, up from the booth. This is a de novo review on causation. The red herring in this case is the CARMEX and the throat lozenges. That, to me, is a red herring and disingenuous to believe that a fenal count, an abnormal fenal count three days post-occurrence is related to CARMEX when nobody ruled out these other issues at the time of the urine count or even a year afterwards. That was given in an evidence deposition as other substances that contain fenol. And don't forget, there was a demolition project in Room 212 at Argonne National Laboratory. There was a demolition project of walls. Who's to say that the fenol didn't come from the walls and not only the thermometer? Because many people were exposed during the event and subsequent to it. One of the things that Liken relies upon here is that other people were also exposed and also had the same complaints. That counts, that amounts to your decisions in looking at this case and determining that the arbitrator and the commission made erroneous findings. They relied on flawed testimony and evidence here. The evidence can't be any clearer. And I know it's hard to sit in the back of this room and listen to argument after argument, just like in the U.S. can in the Sanborn case, when people just have this, they slightly tip the scale, which is what we have done here by establishing a prima facie case. Did Dr. Liken testify? By evidence deposition? No, he did not testify. All of his records were submitted. But we've established our prima facie case. We've tipped that scale to indicate that he was exposed and there was causation afterwards. And I would ask this Honorable Court to reverse the decision of the Circuit Court of Will County and find that the exposure did cause Mr. Hodges' disability. Thank you.